CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
12/22/2022
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
    DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

| | |
|---|---|
| EMILE VALENTIN DAVIS,  *Petitioner*, | CASE NO. 6:22-CV-00050 |
| v. | MEMORANDUM OPINION |
| MOLISSA RENE LAKE,  *Respondent.* | JUDGE NORMAN K. MOON |

Petitioner seeks the return of the parties' two children to Anguilla. Dkt. 1. Having filed this case pursuant to the Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670 (1986) (the "Hague Convention") and the International Child Abduction Remedies Act (the "ICARA"), 22 U.S.C. §§ 9001–11, he argues that Respondent wrongfully relocated them to the United States. The Court denies the petition, finding that Petitioner had established a prima facie case for wrongful removal, but Respondent adequately showed Petitioner consented to children's removal from Anguilla.

## I. Findings of Fact

Petitioner and Respondent are the divorced parents of minor children, eleven-year-old A.V.D.D. and nine-year-old V.E.A.D. When the parties divorced in 2016, the Anguillan High Court of Justice ordered joint custody of the children, with Respondent (the children's mother) receiving primary care and control, and Petitioner (their father) having weekend visitation once a month and on alternating holidays. Petitioner's Trial ("Pet. Tr.") Ex. D ¶¶ 1–2, 6–8 ("Custody Order"). That court also ordered that the parties exchange the children's travel documentation;

that Respondent "shall consult with the [Petitioner] if she intends to change the school(s) of the family"; that "[t]he parties shall have unrestricted telephone access to the children of the family whilst the children [] are in the care of the other party"; and that "[t]he children of the family shall have unrestricted access to telephone the [father or mother] using free apps at reasonable times of day between the hours of 7 a.m. and 7 p.m." *Id.* ¶¶ 4, 9, 10.

Anguilla and St. Martin are separate island territories in the eastern Caribbean Sea—and travel between the two islands involves only an approximately twenty-five-minute ferry ride. Anguilla is a self-governing overseas territory,[1] and St. Martin is an overseas collectivity of France.[2] The children have St. Martin birth certificates and carry French European passports. Pet. Tr. Exs. A, B. Petitioner does business in both Anguilla and St. Martin, and he has property in both. Draft Trial Transcript ("Trans.") at 61.

The Custody Order also set Petitioner's monthly child support obligation, which Petitioner often paid late. Pet. Tr. Ex. D ¶ 3.[3] Petitioner testified that he had made some payments—

---

[1] *Anguilla*, The World Factbook, CIA.Gov, https://www.cia.gov/the-world-factbook/countries/anguilla/#government (last visited Dec. 20, 2022).
[2] *Saint Martin*, The World Factbook, CIA.Gov, https://www.cia.gov/the-world-factbook/countries/saint-martin/#government (last visited Dec. 20, 2022).
[3] *See, e.g.*, Pet. Ex. N at 4 (July 28, 2020, Respondent texting Petitioner to transfer funds since he "didn't deliver on his word" to do so); *id.* at 9 (September 2, 2020, Respondent texting "I pray that you work on making timely payments as it's quite a strain on me having to take care of my obligations and meet the demands of the children's needs."); *id.* at 33 (January 14, 2021, Petitioner texting "My bank just advised me that the $750 sent last week was returned. We will now resend it for [A.V.D.D.'s] birthday budget."); *id.* at 35–36 (January 17, 2021, messages concerning alleged $3,200 and $750 transfers from Petitioner to Respondent were never received); *id.* at 50 (February 19, 2021, Petitioner stating "I was at the bank today and they should hopefully be putting the moneys [sic] back into the account today. I will do it the previous way, which is to take the cash to Republic Bank ([]where I don't have an account) and wire transfer the funds, which will include the added $750 for her birthday event."); *id.* at 52 (March 19, 2021, Petitioner writing "I had wired you $3200 + $750 before i [sic] had traveled to Axa[.] I don't know when but I did indicate that the monies were lost and took awhile to only recently be returned dispite [sic] constant communique with the bank. . . Well this week the $3200 was resent finally and once you indicate that you have received it the $750 for the party will be sent

conceding some were paid late—and sent messages to Respondent reporting that he had made some payments. *See* Trans. at 8, 9, 10, 13, 49–50, 51, 52–53. He also transferred money to Respondent for A.V.D.D.'s birthday party in January of 2021, a party that he attended. *Id.* at 31, 47. And he paid for some school and art supplies for the children. Pet. Tr. Ex. N. at 10; Trans. at 109. At trial, Petitioner produced a summary of his claimed child support payments from 2016 through 2021, totaling $52,036.14. Pet. Tr. Ex. O. Though he claimed to have the underlying documentation proving payments, he failed to provide any—explaining that he'd left it back in his office and that he didn't know he should have brought it to his evidentiary hearing. Trans. at 46–47, 50. He even claimed to have paid support for a year in advance, but his testimony regarding having fulfilled his payment responsibilities was unpersuasive. *See* Trans. at 25–30, 43–51, 54–60, 107–10. This was particularly so given Respondent's testimony and Anguillan court proceedings against him for failure to pay. *Id.* at 210 (Respondent stating that a court clearly indicated Petitioner would be in prison if he neglected his child support, which he had done for years). Respondent testified that she was reluctant to take him back to court for fear of her children's father being jailed. *Id.*

Petitioner visited the children less frequently than the Custody Order allowed. For instance, in 2020 and 2021, Petitioner saw the children twice in total. As of March 2020, the COVID-19 pandemic restricted travel, and he blamed his failure to visit on this. *Id.* at 13. After the travel protocols began, Petitioner did not visit his children for about ten months—until A.V.D.D.'s tenth birthday party on January 29, 2021. *Id.* at 12–14. Petitioner said that he had to complete a fourteen-day quarantine before entering their community. *Id.* at 13, 29 (Petitioner discussing his

---

along with another $3200."); *id.* at 54–55 (April 28, 2021, messages discussing continued issues with transferring funds).

quarantine process); *see also id.* at 179 (Respondent explaining that Anguilla residents could come to the island whenever they desired, and they were just subject to the fourteen-day quarantine requirement). And he stayed at a hotel because his home was not qualified for a quarantine period stay. *Id.* at 29. He also saw his children on September 3, 2021. *Id.* at 15. COVID-19 protocols had changed by that point, so he quarantined for four days and took a COVID-19 vaccine to see them on that date. *Id.* He planned to see them next in November 2021. *Id.* at 15.

However, before the COVID-19 pandemic, Petitioner similarly failed to visit the children as often as the Custody Order allowed. *Id.* at 230–31, 17, 11–14 (Petitioner discussing vacations before the pandemic), 63 (Petitioner discussing visitation at their school), 177–79 (Respondent discussing Petitioner seeking less visitation time), 191–92 (Respondent discussing Petitioner missing weekend visitations and cutting weekends with the children short when he did visit), 216 (his daughter A.V.D.D. testifying that Petitioner did not stay with the children for a long time), 218 (A.V.D.D. testifying that in 2019 Petitioner did not visit the children during the last weekend of every month). Indeed, at one point he petitioned the Anguillan court to get less visitation time. *Id.* at 177–79. He gave no reason for not taking steps during the pandemic to visit the children more frequently, and he testified that he did business and had a home in Anguilla, as well as in St. Martin.

In January 2020, Respondent told Petitioner about her engagement, intention to marry, and plan to relocate with the children to Virginia. *Id.* at 180. Respondent testified that Petitioner consented to the relocation, even suggesting that he and Respondent each be responsible for the

purchase of a ticket per child. *Id.*[4] She also offered to meet him with the children in St. Martin to discuss the move in person. *See* Pet. Tr. Ex. N at 74–75 (showing a related text exchange from September 8, 2021). Respondent also stated that in January 2021 Petitioner inquired about her marriage plans. Trans. at 182. She told him she was going to get married but could not give him an exact timeline because of COVID-19 and its restrictions on travel. *Id.* To the contrary, Petitioner testified that when Respondent brought up relocation he sought to initiate a follow-up conversation with her, but he was not consenting to relocation in that process. *Id.* at 87–89.

In May 2021, Respondent needed to get a new passport for A.V.D.D. after the previous passport expired, and Petitioner helped her with the passport renewal. *Id.* at 182–83. Respondent told Petitioner she was still getting married and needed A.V.D.D. to have a passport for when they would be ready to travel. *Id.* Petitioner repeatedly changed the date at which he agreed to send Respondent a renewed passport, but he did send it in the summer of 2021. *Id.* at 185, 208.

A WhatsApp message from Petitioner to Respondent on September 8, 2021, made clear his knowledge of Respondent's plans, as well as corroborates Respondent's testimony of his consent to their move:

> In January of 2020, you had indicated to me that you would be moving during the summer of that same year to the USA to live fulltime [sic] with the children. We have had a pandemic since than [sic] However, when I tried to inquire this January 2021, who [sic] did not give me any information on what those previous plans were for the short nor long term. Can you kindly inform me accordingly if the children will be still relocating to the USA and if so, when most likely.

---

[4] "So I vividly remember sitting down on my deck with [Petitioner] and we spoke at length about my engagem[e]nt, about my marriage, my relocation plans with the children. And [Petitioner] consented. He even suggested that we each be responsible for the purchase of a ticket per child. At his request I agreed to send lots of pictures. He also asked me to update him on the progress of the school with the kids and, you know, that we each are going to visit. You know, so it was a very [] -- it was a very good conversation. He even said he was going to miss us but he wished us the best. So I was very surprised that he was very selective in his memory in regards to that." Trans. at 180.

Respondent's Trial ("Resp. Tr.") Ex. A; *see also* Trans. at 88–89, 207.

Respondent sent Petitioner a note on September 10 that she was going with the children to "SXM," which is the airline abbreviation for St. Martin. Trans. at 35–36 ("Well, the mother had sent me a note saying we're going to St. Maarten. She wrote S X M which is short for St. Maarten."). Petitioner testified that normally one says "SXM" when referring to just going to St. Martin, the island. *Id.* at 36. He testified that, if someone is traveling to a destination beyond St. Martin, they would say that location's name instead of saying "SXM." *Id.* But when asked about this at trial, Respondent said she spoke with him the night before, telling him she was coming to his house, and he said she could not come because he was going to a party. *Id.* at 200. And she communicated with him on the phone that she and the children were traveling to Virginia. *Id.*[5] Eleven-year-old A.V.D.D. also testified that she told her father they were going to Virginia, and when asked when they were going, she told him to ask her mother. *Id.* at 227.

Before the children moved, Respondent sent Petitioner a card from the Anguilla educational department, which said the children would be online schooling in Anguilla. *Id.* at 16. However, Respondent relocated the children to Virginia, leaving Anguilla with them on September 10, 2021. *Id.* at 101, 199. Around September 17, 2021, Respondent called Petitioner and told him she put the children in school in Virginia. *Id.* at 23. She informed Petitioner she was not sure of her return date and that she would keep Petitioner updated on her travel plans. *Id.* at 24 (referencing Pet. Tr. Ex. N. at 77). Respondent bought A.V.D.D. and V.E.A.D. phones with which they could communicate with Petitioner. Trans. at 190. There was a period in which

---

[5] "Excuse me, I spoke with him the night before when I called and told him that I was coming to his house and he told me I couldn't come because he was going to a party. I spoke to him and communicated that the kids and I were traveling to Virginia. I called him and I told him this. So he has knowledge about that. He has full knowledge. And also the kids said to me, too, that they spoke to him about it." Trans. at 200.

A.V.D.D.'s phone needed to be activated, but A.V.D.D. could be reached via V.E.A.D. or Respondent's phone. *Id.* at 190–91.

Respondent married on November 20, 2021. *Id.* at 174.

In response to her statements around September 17, 2021 about putting the children in school in Virginia, Petitioner testified that he wrote to Respondent telling her he was not comfortable with the children's move and wanted her to return the children. *Id.* at 24; *see also* Pet. Tr. Ex. N at 76 (message from Petitioner to Respondent on September 17, 2021). He contacted the local social welfare office and social services. They instructed Petitioner to hire an attorney, who, in communication with the Anguillan Attorney General, started a case in the Anguillan High Court of Justice, which was not filed until February 2, 2022. *Id.* at 24, 31; Pet. Tr. Ex. L. And it was heard without notice to Respondent on February 17, 2022. *Id.* The Anguillan High Court of Justice entered an Order on March 14, 2022, declaring the removal of the minor children from Anguilla was wrongful under Anguillan and international law. *Id.* Respondent did not have notice of the Anguilla High Court of Justice case or the Hague Convention proceeding, though Petitioner had knowledge of Respondent's precise contact details. *See id.*; Trans. at 102–03, 132, 135, 137–40, 163, 172.  Regarding that lack of notice, Petitioner testified that the Attorney General was handling the matter and it was out of his hands. *See id.* at 95–96, 102–03. The Court finds Petitioner's testimony in this respect partially incredible—especially given that Respondent's name was forged on the court's enforcement order—i.e., the document from the Anguillan High Court stating that Respondent wrongfully relocated and retained the children. *Id.* at 206; *see also* Pet. Tr. Ex. L.

Petitioner testified that the Anguillan Attorney General's office later helped him submit an application under the Hague Convention with the U.S. Department of State. Trans. at 32.

Petitioner applied for relief through the U.S. Department of State on May 3, 2022, requesting that the children be returned according to the Hague Convention. Pet. Tr. Ex. F. On the same date, Petitioner also applied for assistance through the U.S. Department of State Hague Convention Attorney network, through which he connected with counsel and now brings this matter before this Court. *Id.*

Since moving to Virginia, the children have been doing well in school and are involved in a local church and school activities. *See, e.g.*, Resp. Tr. Ex. B (student report cards); Trans. at 197, 224, 233. Minor child A.V.D.D. testified that, if returned to Anguilla, she would run away and turn to drugs. Trans. at 223. She testified as to liking her new life in Virginia, particularly her family, church, school, and friends. *Id.* at 224. She appeared disaffected with her father. *Id.* at 220 (A.V.D.D. texted her father on September 17, 2021, explaining that he could visit her, but also expressing that even when A.V.D.D. was still in Anguilla, she and her father did not spend much time together); Resp. Tr. Ex. C ("We chat u can see me any time u can visit u I can visit u me. mom just happen to move on with her life. And even when I lived in Anguilla we never talked much and hardly spent time together. And before u visit me in last August I hadn't seen u since January so please don't make it sound like we spend so much time together. The fact is you will always be my dad weather I live in Anguilla or Virginia. [sic throughout]"). And A.V.D.D. expressed that, though she would not want to return to Anguilla, she likes to visit. Trans. at 223.

Nine-year-old V.E.A.D. also testified that he loves living in Lynchburg because of the fun places to play, the fast-food restaurants, his school, and his friends. Trans. at 232. He enjoys activities outside of school like field trips and basketball camp. *Id.* at 233. And he said that he learns more in school. *Id.*

The Court finds Respondent was a credible witness. She was straightforward and her testimony was corroborated by documentary evidence, particularly the WhatsApp messages. On the other hand, Petitioner was not credible. He exhibited a lack of forthrightness and candor, and his testimony was frequently inconsistent with the documentary evidence.

## II. Conclusions of Law

### A. Legal Framework

The Hague Convention establishes legal rights and procedures for the prompt return of children under age sixteen "wrongfully removed to or retained in" a nation which is a party to the Hague Convention. Hague Convention, art. 1. Both Anguilla[6] and the U.S. are signatories to the Hague Convention, and the U.S. has implemented the Hague Convention through the International Child Abduction Remedies Act ("ICARA"). *See* 22 U.S.C. §§ 9001, *et seq*.

"The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). As such, this Court's inquiry "is not what is in the best interests of the child." *Wertz v. Wertz*, No. 7:18-cv-00061, 2018 WL 1575830, at *7 (W.D. Va. Mar. 30, 2018) (citing *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 610–11 (E.D. Va. 2002), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002)). The Court's inquiry is solely confined to rights under the Convention. Thus, the Court's role is limited to the following: "whether there has been a wrongful removal, the existence and exercise of custody rights at the time of the removal, and

---

[6] *See* U.S. Dep't of State Bureau of Consular Affairs, *U.S. Hague Convention Treaty Partners*, Travel.State.Gov, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited Dec. 20, 2022).

the applicability of any Hague Convention defenses." *Id.* at *1.

### B. Prima Facie Case

A petitioner seeking return of a child based in the Hague Convention and the ICARA must first establish by a preponderance of the evidence that the minor children were "wrongfully removed or retained within the meaning of the Convention." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (quoting 42 U.S.C. § 11603(e)(1)(A)); *see also id.* at 396 (discussing that the ICARA implements the Hague Convention); *see* 22 U.S.C. § 9003(e)(1)(A). Under the Hague Convention, removal or retention of a child is "wrongful" if the following conditions are met:

> (a) it is in breach of rights of custody attributed to a person, an institute or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

Hague Convention, art. 3. Thus, to make a prima facie case of wrongful removal, Petitioner ultimately must establish the following: (1) the children habitually resided in Anguilla at the time Respondent removed them to the U.S., (2) Petitioner had been exercising his custodial rights at the time of removal, and (3) the removal violated Petitioner's custody rights under Anguillan law. *See Wertz*, 2018 WL 1575830, at *8; *Miller*, 240 F.3d at 398 (citing Hague Convention, art. 3, T.I.A.S. No. 11,670, at 2). For the following reasons, the Court concludes that Petitioner has established each of these elements, and thus shown a *prima facie* case of wrongful removal under the Hague Convention.

#### 1. Habitual Residence

The Court finds that the children's habitual residence prior to removal was Anguilla, a fact

that is not contested. Respondent had primary custody of the children and maintained a home in Anguilla before moving to Virginia. Pet. Tr. Ex. D ¶¶ 1–2; Trans. at 205. Petitioner did business in and had residences in both Anguilla and St. Martin, and the children were familiar with his residence in Anguilla. Trans. at 10, 62–63. Petitioner and Respondent's joint Custody Order came from the High Court of Anguilla. Pet. Tr. Ex. D.

### 2. Exercising Custody Rights

Second, Petitioner must show he was exercising his custody rights at the time of the children's removal. The Hague Convention defines custody rights as the "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). And the Convention states that "rights of custody . . . may arise in particular operation of law or by reason of an administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3. Courts consider custody status at the time of the alleged wrongful removal, for purposes of the Hague Convention. *Miller*, 240 F.3d at 401.

In the Fourth Circuit, courts should "liberally find 'exercise [of custody]' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996)) (also citing *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004); *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005)). Thus, "a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id.* (quoting *Friedrich*, 78 F.3d at

1066). And "[o]nce [the court] determines the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Id.* (quoting *Friedrich*, 78 F.3d at 1066).

The Anguillan High Court of Justice established custody and visitation rights of the minor children for the parties. Pet. Tr. Ex. D. Petitioner received weekend visitation once a month and alternating holidays, which he exercised haphazardly. *Id.* ¶¶ 6–7. And Petitioner had a monthly child support obligation, *id.* ¶ 3, which he frequently paid late. Respondent testified that he has been behind on his payments. *E.g.*, Trans. at 24–25, 43. Petitioner also visited much less frequently than the Custody Order permitted. *Id.* at 177–79, 191–92, 216, 218; *Rodriguez Palomo v. Howard*, 426 F. Supp. 3d 160, 176–77 (M.D.N.C. 2019); *Hart v. Anderson*, 625 F. Supp. 3d 545, 564 (D. Md. 2019).

Still, the record does not support Petitioner's clear and unequivocal abandonment of the minor children at the time of their removal. He saw them twice between March 2020 and January 2021, during COVID-19-related travel restrictions, indicating he did not *completely* abandon them, and he apparently paid most child support, although frequently late. As a "parent cannot 'fail' to exercise his or her custody rights short of abandoning the child," the Court finds that Petitioner was exercising his custodial rights within the meaning of this element of the Hague Convention framework. *Nowlan v. Nowlan*, 543 F. Supp. 3d 324, 362–63 (W.D. Va. 2021) (quoting *Bader*, 484 F.3d at 671).

Thus, the Court concludes that, though much of Petitioner's discussion of his exercise of custodial rights was unpersuasive, Petitioner has met the low standard of showing by a preponderance of the evidence that he was exercising his custody rights at the time of the children's removal.

### 3. Custody Rights Under Anguillan Law

Third, Petitioner must show Respondent breached her custody rights under Anguillan law. Assuming the validity of the Anguillan High Court's Slip Rule Order, Pet. Tr. Ex. L, which held that the removal of the children from Anguilla was wrongful, the Court assumes that Respondent breached her custody rights under Anguillan law. *See Miller*, 240 F.3d at 400 ("We note, however, that 'American courts will normally accord considerable deference to foreign adjudications as a matter of comity.' Indeed, 'comity is at the heart of the Hague Convention.'") (internal citations omitted).

However, though Petitioner establishes a *prima facie* case, Respondent establishes two exceptions under the Hague Convention.

## C. Hague Convention Exceptions

"If a petitioner can demonstrate a *prima facie* case, the court must order the child[ren]'s return to the country of habitual residence unless the respondent can establish one of the exceptions under the Hague Convention." *Nowlan*, 543 F. Supp. 3d at 363 (citing Hague Convention, arts. 12–13, 20). If one of these limited exceptions applies, a court is "not bound to order the return of the child." Hague Convention, art. 13; *see Abbott v. Abbott*, 560 U.S. 1, 22 (2010) ("Return is not required if the abducting parent can establish that a Convention exception applies."). Two exceptions apply: Petitioner consented to the children's removal, and a mature child objected to being returned.

### 1. Consent or Acquiescence

If Petitioner "had consented to or subsequently acquiesced in the removal," the children do not have to be returned. *Miller*, 240 F.3d 392 at 399 (quoting Hague Convention, art. 13a) (emphasis added). Consent or acquiescence must be shown by a preponderance of the evidence. *Padilla v. Troxell*, 850 F.3d 168, 175 (4th Cir. 2017). The Fourth Circuit has held that "[t]o establish consent, we focus on the parties' conduct *prior* to the removal or retention," though "a petitioner's conduct *after* removal can further inform whether []he consented at the time of removal." *Id.* (internal citations omitted). The Court finds that Respondent has established that Petitioner consented in the children's removal.[7]

Respondent testified that in January 2020 she told Petitioner about her engagement, intended marriage, and plan to relocate to Virginia with the children. Trans. at 180. And she testified that at that time, Petitioner consented to their move to Virginia and further offered that he and Respondent each be responsible for the purchase of a ticket per child. *Id*. The Court found Respondent's testimony on this issue and her description of her other communications with Petitioner to be forthright and credible, as well as supported by contemporaneous evidence. When Petitioner did not answer Respondent's later call attempting to further discuss the trip with him, she offered to meet him with the children in St. Martin to discuss the trip in person. *See* Pet. Tr. Ex. N at 74–75 (showing a related text exchange). To be sure, Petitioner presented a contrary narrative. He testified that, when Respondent brought up relocation, Petitioner merely sought to initiate a follow-up conversation—but that he hadn't consented to their move. Trans. at 87–89. However, the Court found Petitioner's testimony lacking in credibility, forthrightness, and candor, and further it was belied by documentary evidence. Significantly, prior to the children's

---

[7] Because the Court finds the consent defense applies, it does not consider whether the record also supports finding that Petitioner acquiesced in the children's removal or retention. *See Troxell*, 850 F.3d at 176.

relocation, Petitioner expressly acknowledged Respondent's plans to move with them, as shown by his text message to her on September 8, 2021:

> In January of 2020, you had indicated to me that you would be moving during the summer of that same year to the USA to live fulltime [sic] with the children. We have had a pandemic since than [sic] However, when I tried to inquire this January 2021, who [sic] did not give me any information on what those previous plans were for the short nor long term. Can you kindly inform me accordingly if the children will be still relocating to the USA and if so, when most likely.

Resp. Tr. Ex. A. The content of this text message is aligned with and supports Respondent's testimony that Petitioner was aware of and agreed to their move, and at most he sought details on their plans—it in no way indicates that Petitioner had any objection to their move. And by not objecting despite clear knowledge of the planned move, Petitioner further bolstered Respondent's credible testimony that Petitioner consented to their move to Virginia. Accordingly, the Court finds that "a preponderance of the evidence demonstrates Petitioner consented to the [children's] removal to the United States." *Padilla*, 850 F.3d at 176–77.

Thus, Respondent established the consent defense by a preponderance of the evidence, and the Court accordingly finds that the children should not be returned to Anguilla.

### 2. Mature Child's Objections

The Hague Convention also has an "age and maturity defense" exception. Under this exception, a court is not required to order the return of a child wrongfully removed if the court determines by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13; *Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 596 (D.S.C. 2013) (internal citations omitted); 22 U.S.C. § 9003(e)(2)(b). And "[a] court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation

decision and not part of some broader analysis." *Alcala v. Hernandez*, No. 4:14-cv-04176, 2015 WL 4429425, at *13 (D.S.C. July 20, 2015), *aff'd in part and appeal dismissed in part*, 826 F.3d 161 (4th Cir. 2016), (citing *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007)). Here, the Court considers a child's wishes in combination with Petitioner's consent to the relocation.

The Hague Convention sets no specific age for determining when a child is mature enough for the court to consider the child's objection to being returned. *Id.* (internal citations omitted). Children younger than eleven-year-old A.V.D.D. have been found sufficiently mature. *E.g.*, *Lopez v. Alcala*, 547 F. Supp. 2d 1255 (M.D. Fla. 2008) (finding a ten-year-old had reached an age of maturity but ordering return because the child's return-related fears were unfounded). Courts within this district have previously considered a child's testimony under oath to determine maturity. *Alcala*, 2015 WL 4429425, at *13. The Court finds that A.V.D.D. displayed maturity for her age overall and demonstrated an understanding of the importance of the proceedings when testifying under oath, subject to cross-examination.

"[T]he court must distinguish between a child's objections as defined by the Hague Convention and the child's wishes in a typical child custody case, the former being a 'stronger and more restrictive' standard than the latter." *Hirst*, 947 F. Supp. 2d at 597 (internal citation omitted). And "the court should be wary of whether the child's objection 'is the product of the abductor parent's undue influence over the child,' even if the influence is unintentional." *Kovačić v. Harris*, 328 F. Supp. 3d 508, 521 (D. Md. 2018) (internal citations omitted); *see also Hazbun Escaf*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002) ("The discretionary aspect of this [age and maturity] defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child.") ("[T]he district court's finding that a child has or has not objected is a fact-intensive determination that is based in part on the court's personal

observations of the child." (quoting *Custodia v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016) (internal quotations and citation omitted))). Objections must be "born of rational comparison" between life in the new country and the habitual country of residence. *Alcala*, 2015 WL 4429425, at *14 (citing *Castillo v. Castillo*, 597 F. Supp. 2d 432, 441 (D. Del. 2009)).

Courts within the Fourth Circuit have recognized the Third Circuit's emphasis that a "lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home." *Kovačić*, 328 F. Supp. 3d at 523 (citing *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 280 (3d Cir. 2007)). And courts within the Fourth Circuit have previously found that, even if a child is sufficiently mature, if a child expresses a desire to remain in their new area rather than a strong objection to return to their habitual residence, the mature child exception is more likely inapplicable. *Hirst*, 947 F. Supp. 2d at 598.

A.V.D.D. testified that she objected to returning to Anguilla because she likes her new life in Virginia, particularly her family, church, school, and friends, noting she has more friends in Virginia than she did in Anguilla. Trans. at 224. Thus, her objection to return is not just based on comfort in her new surroundings but in specific aspects of her life that she finds superior in the U.S. Her objection seems not to be a preference "for one lifestyle over another," but an objection "born of rational comparison" between the U.S. and Anguilla. *Alcala*, 2015 WL 4429425, at *14.

The Court further finds that A.V.D.D.'s objection to returning to Anguilla does not appear to be the product of Respondent's undue influence. Though A.V.D.D. testified that her mother would cry if A.V.D.D. were returned, which would prompt A.V.D.D. to also cry, A.V.D.D. said she would not want to return to Anguilla with *either* her mother or father. Trans. at 223, 227. She also expressed that she likes to visit Anguilla, though she would not want to return there

permanently. *Id.* at 223. The Court finds that the reasons for A.V.D.D.'s objection are not tied to a desire to avoid Petitioner. *See Kovačić*, 328 F. Supp. at 525; *Vasconcelos v. Batista*, 512 F. App'x 403, 408 (5th Cir. 2013).

Though "there is a 'demonstrated disinclination' among courts to defer to a child's objection as a basis to deny a petition," the Court finds that A.V.D.D.'s objection to return, coupled with Petitioner's consent to the children's relocation, supports denying the petition. *Trudrung v. Trudrung*, 686 F. Supp. 2d 570, 578 (M.D.N.C. 2010) (internal citations omitted).

While the Court does not find that nine-year-old V.E.A.D. showed sufficient maturity when testifying, the Court notes that he testified as to liking life in Virginia because of the fun places to play, the fast-food restaurants, his school, his friends, and activities outside of school. Trans. at 232–33. The Court also notes his testimony that his mother did not speak with him much about the case. *Id.* at 238.

### III. Conclusion

While Petitioner has established a *prima facie* case of wrongful removal under the Hague Convention, Respondent has proven that Petitioner consented to the children's relocation, an exception under the Hague Convention, and that A.V.D.D. wants to remain in Virginia, having proffered a mature child's objection. Weighing the exception, objection, and Petitioner's unpersuasive testimony at the bench trial, the Court denies the petition for return of the children to Anguilla.

The Court notes that, though the Court is not in a position to determine the best interest of the children, *see Hazbun Escaf*, 200 F. Supp. 2d at 610–11, the parties are not foreclosed from pursuing custody disputes in the Anguillan courts to seek different arrangements.

Because the Court ruled without need for Respondent's revised proposed findings of fact and conclusions of law, the Court finds that Respondent's motion for leave to file her Proposed Revised Declaration of Foreign Law, Dkt. 50, and Petitioner's Motion to Strike Respondent's Revised Proposed Findings of Fact and Law, Dkt. 53, are moot.

\* \* \* \*

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this __22nd__ day of December, 2022.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE